## DR. A. A. WEBER v. THE GUARDIAN LIFE INS. CO. OF AMERICA.

Western Section.    February 26, 1926.

Certiorari denied by Supreme Court, June 5, 1926.

1. Trial. Motion for peremptory instruction present a question of law.

A motion for peremptory instructions is not one which addresses itself to the discretion of the court, but one which presents a question of law; and the crucial question in the case is whether there is any determinative evidence upon which the jury must base a verdict in favor of the party who produces it.

2. Evidence. Material evidence means evidence material to the question in controversy.

By material evidence is meant evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy, and by itself, or in connection with the other evidence, be determinative of the case.

3. Trial. Material evidence on a separate feature or fact will not prevent the giving of a peremptory instruction.

A conflict of the evidence upon a detached or separate feature or fact, even though it is material, should not of itself prevent the giving of peremptory instructions. Facts are frequently material which are by no means determinative; and facts are frequently material in themselves, but become immaterial when taken in connection with the other facts.

4. Insurance. Suicide clause in a life insurance policy is valid.

A suicide clause in a life insurance policy which provided that there should be no recovery on the policy if the insured should commit suicide or die by his own hand or act whether sane or insane, held valid and binding on the party and there could be no recovery on the policy where the insured committed suicide regardless of whether sane or insane at the time.

Appeal from Chancery Court, Shelby County; Hon. Israel H. Peres, Chancellor.

Affirmed.

W. B. Cowan and U. A. Burgess, of Memphis, for appellant.

Siveley, Evans & McCadden, of Memphis, for appellee.

OWEN, J. The complainant below, Dr. A. A. Weber, has appealed from a decree of the chancery court dismissing his bill. On March 31, 1924, the Guardian Life Insurance Company hereinafter called the defendant, issued a policy of insurance for the sum of $2000 to Henry George Weber, Jr. The beneficiary named in said policy was Jessie Lowrie Weber, wife of said Henry George Weber, Jr., hereinafter called the insured; and, in case of death of the said named beneficiary prior to the death of the insured, the policy was payable to the insured's estate. Jessie Lowrie Weber died a few minutes before the death of the insured. The undisputed proof shows that both the beneficiary, the wife, and the insured met tragic deaths in the city of Memphis, November 13, 1924, or within about eight and a half months after the issuance of the insurance policy.

Among the various clauses in said policy, there is one known as No. 17, as follows.

"17. Self-Destruction—If the insured shall, within one year from the date hereof commit suicide or die by his or her own hand or act, whether sane or insance at the time, the liability of the Company shall be limited to the amount of the reserve for this policy, computed according to the American Experience Table of Mortality with interest at the rate of three per centum per annum."

After the death of the insured, complainant qualified as administrator and instituted this suit.

The defense made to complainant's bill was that there was no liability on the part of the defendant because the insured either had committed suicide or had died by his own hand or act. A jury was called for and the following issue was submitted at the trial to the jury: "Did Henry George Weber, Jr., the assured, now deceased, commit suicide or die by his own hand or act on or about November 13, 1924." At the conclusion of all the proof, upon motion of the defendant the court instructed the jury to answer said issue "yes." The complainant filed motion for a new trial, which was overruled, prayed and was granted an appeal to this court, perfected the same, and has assigned nine errors in this court. These errors raise the following propositions:

First: The court was in error in sustaining defendant's motion for a directed verdict and in directing the jury to answer the issue in the affirmative.

Second: That the court was in error in dismissing complainant's bill.

Third: That the court was in error in holding that the insured committed suicide.

Fourth: That the court was in error in holding that under the insurance contract sued on it made no difference whether the in-

sured was sane or insane at the time he committed the alleged act.

Fifth: That the court was in error in holding that clause 17 heretofore quoted was reasonable and binding on the insured.

The real issue that determines this case is whether or not the insured died by his own deed or own act and did the court properly instruct the jury to return a verdict in favor of the insurance company or answer the issue submitted "yes.".

The facts surrounding the horrible tragedy that has been presented, briefly stated, are as follows: The insured was twenty-eight years of age; he had lived in Memphis seventeen years. He conducted a barber shop on Young avenue in Memphis. He was a married man and it appears that he had become very jealous of his wife. He and his wife had been estranged for about a week. She was living in the home of a Mr. and Mrs. Shader, who lived about three hundred feet from the insured's barber shop. About eight o'clock P. M. on the day of the insured's death and after the other barbers had left the shop, the insured took a high-powered automatic rifle, went to the home of the Shaders, killed Mr. and Mrs. Shader, a Mrs. Alexander and also killed his (insured's) wife. The other occupants of the home escaped and by their screams attracted the attention of the neighbors. The insured was seen to run from the Shader home back into his shop and close the door. About this time two policemen came into the vicinity in an automobile. One patrolman ran into the Shader home; Patrolman Faught ran to the barber shop. He testified that as he jumped out of the car he heard a shot in the barber shop. He reached the front door; he knew the insured and had known him for many years. The front door was locked. The officer demanded admittance. The insured was in the rear of the shop, which portion of the shop was lighted. The depth of the barber shop was about fifty feet, and twenty-seven feet from the front door was a curtain partition. The curtains were somewhat drawn back from the center. Officer Faught testifies that after he called to the insured to open the door the insured turned his face towards the officer with the rifle in his hand; that he (the officer) heard a report from the gun and the insured fell to the floor. By that time the officer had broken the front door open and entered. He testified that the insured exclaimed "My God! do something for me," or words to that effect. There was a large hole in the insured's head, a great pool of blood had already flowed from the wounds, and the insured had the gun in his hand. On a cabinet near the insured, the officer found a tablet and in the same was the following.

"My name is Henry George Weber, Jr. My father works for a Yellow Cab Co. The key I have in my pocket is to my Barber Shop 2152 Young 2152 give it to Brother Reese.

"Remington Model 25 25-20 I paid $18 for it.

"Sister Kate, take care and see that paper send me and Jessie to Hopkinsville together beside mama good by for ever

"Henry Weber.

"Katie put my new suit on me the gun I killed myself with belongs to me get it and keep it I paid $18 for it it is a model 25 25-20.''

The officer found some empty shells on the floor that were the same size as the shells used by the rifle in the insured's hand. He also found loaded shells in this rifle and one or two shells that had been exploded or discharged, in the rifle. It appears that the chamber of the rifle held six or seven shells. The writing found in the tablet the officer turned over to his superior in a few minutes after the tragedy and it was preserved and presented at the trial. The handwriting or signature of Henry Weber is the same as signed to the application for insurance. Members of Weber's family testify that they did not know his handwriting, but the proof shows that they carried out the instructions or requests made in the writing found in the tablet. The barber shop was turned over to the insured's brother Reese; the insured was buried at Hopkinsville, Kentucky, and the insured's father was a chauffeur for the Yellow Cab Company. Officer Faught further testified, and it is undisputed, that the back door of the shop was locked and there was no one in the shop except Weber at the time when Faught entered. Faught's testimony is very straight-forward, very intelligent and wholly disinterested. It is true that one witness testified he heard four shots from the barber shop; another that he heard three, but the proof shows that there was much excitement in the vicinity of the barber shop at the time the deceased was killed. It is the theory of the complainant that someone murdered the insured, but there is not a scintilla of proof to establish this theory. The witness Moore who saw the insured enter the barber shop followed closely behind Officer Faught. He didn't hear the insured make any statement or give any exclamanation, and he testified that the gun was lying on the floor, but this testimony insofar as it does not agree with the testimony of Officer Faught is immaterial. The proof shows that the family of the deceased accepted the suicide theory and never asked the police department to make any investigation in regard to murder. The insured was in the shop about ten minutes before a shot was heard.

Mr. Tobin, the embalmer, testified that he embalmed the body of the insured and he found a hole in insured's head just slightly to the left of the middle forehead, and also a wound under the lip, as if a glancing bullet had struck him, and did not enter at all. This witness was asked: "Q. Was there any evidence of powder burns;" his answer was: "It was very dark around the edge of

the wound, I don't remember whether they were any powder burns, or not." Without stating further facts, we are of opinion that the only reasonable conclusion that could be drawn by an honest jury from the undisputed facts would be that the insured committed suicide. There is no motive shown, nor is there any proof that anyone else took insured's life.

"A motion for peremptory instructions is not one which addresses itself to the discretion of the court, but one which presents a question of law; and the crucial question in the case is whether there is any determinative evidence upon which the jury must base a verdict in favor of the party who produces it." Traction Co. v. Brown, 115, Tenn., 329.

"By material evidence is meant evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case.

"But a conflict of the evidence upon a detached or separate feature or fact, even though it is material, should not of itself prevent the giving of peremptory instructions. Facts are frequently material which are by no means determinative; and facts are frequently material in themselves, but become immaterial when taken in connection with the other facts.

"To illustrate: We take the common case of a person injured in a railroad accident. It may be a disputed and controverted fact which one of two roads did the injury, and it is therefore a material question to determine which one did it. But it may further develop, that, no matter which road it was, there was gross contributory negligence which proximately caused the injury, and the injured party could not, therefore, recover in any event. In such case, the court should give a peremptory instruction against the plaintiff notwithstanding the conflict of evidence as to who caused the injury or whether the road was itself guilty of negligence. Other illustrations could easily be given.

"So that the disputed fact must not only be material, but in itself or in connection with other facts it must be determinative of the real issue and the merits of the case." Traction Co. v. Brown, 115 Tenn., 331.

We find there is no error in the decree of the chancellor directing a verdict in favor of the defendant and in directing the jury to answer the issue submitted to them in the instant case in the affirmative.

It is next contended that the deceased or insured was insane and an issue should have been submitted to the jury as to whether or not he was insane. This would be an immaterial issue. In our Judgment it makes no difference whether the party was sane or in-

sane at the time he took his life. The undisputed facts and all the material evidence show that he did commit suicide. We reviewed the authorities pertaining to an insurance clause similar to the one now under consideration in the case of Mrs. Lizzie West, Extrx., v. The Perferred Accident Insurance Company of New York, Davidson Law, decided by this court in December, 1921, which was affirmed by the Supreme Court. In that case there was a directed verdict at the conclusion of all the proof. The insured jumped off of a bridge into the Cumberland river, thereby losing his life. It was sought to show that he was insane and this court held that whether he was sane or insane at the time he took his life made no difference. We quote from that opinion as follows:

"In Ruling Case Law it is said with reference to a provision in a policy of insurance against death by 'suicide, sane or insane:'

"To avoid disputes as to the meaning of 'suicide' and definitely fix the extent of the risk, it is not uncommon to incorporate a condition in an insurance contract that it shall be void if the insured die by suicide, sane or insane. No reason is seen why a stipulation exempting the insurer from liability for acts of the insured committed while insane should not be enforced and such a provision is generally conceded to be valid, and to preclude a recovery where the insured comprehended the physical act of suicide, though he could not judge the nature of his act because of insanity . . . .

"The general rule is that a provision that a policy of life insurance shall be void if the insured shall die by his own hand 'whether sane or insane,' covers every case of suicide irrespective of the estate of mind of the insured, and regardless of the nature of the insanity.

"But there is authority (for the most part inferential rather than direct) that even under a clause avoiding the policy in the event of the suicide of the insured, 'sane or insane,' a recovery may be had on the policy of the insured was so insane at the time he committed the act of self-destruction that he did not understand the physical consequence of his act or have the intention to take his own life.

"If a policy provides that it shall be void 'if the insured should die by self-destruction, whether sane or insane,' his beneficiary cannot recover if it is shown that voluntary starvation caused or hastened the insured's death, although he was at the time fatally ill with scurvy, which would have ultimately caused his death. 14 Ruling Case Law, p. 1236, sec. 412.

"In Corpus Juris, it is said:

"'A general provision against suicide without more has been held not to protect the insurer where the insured killed himself while insane; but where the policy expressly excepts suicide, wheth-

er the insured is sane or insane, there can be no recovery in case of suicide under any circumstances, and the fact that an accident produced the insanity by reason of which the insured committed suicide does not render the insurer liable.' 1 Corpus Juris, p. 444.

"In Joyce on Insurance the author says with reference to the effect of the words 'sane or insane' in the suicide clause:

"In order to avoid any question concerning what is meant by the words 'suicide,' or 'death by his own hand,' or by words of like effect, the insurers have generally added the words 'sane or insane' to the proviso. Under these words it is held that if the insured kills himself the policy is avoided, though he may have been of unsound mind and wholly unconscious of the moral nature of the act done; and the degree of insanity is immaterial where one intentionally takes his own life . . .

"Under the added provision 'sane or insane,' 'no kind of degree of insanity will prevent an avoidance, and the courts not only in England but in this country, have almost universally held that with such provision in policies of life insurance the policies are void if insured comes to his death by his own hand.' 4 Joyce on Insurance (2 Ed.), sec. 2635.

"The author further says with reference to the validity and nature of the stipulation:

"Stipulation voiding the policy where insured commits suicide, 'sane or insane,' and the like, are reasonable, not against public policy, valid and enforceable. So it was early declared in the United States Supreme Court that insurer may limit its liability, if assured is in proper language told of the extent of the limitation, and it is not against public policy; that insurer may stipulate against intentional self-destruction, and also that a stipulation in a life policy that it shall be void if the insured shall die by suicide, sane or insane, is valid." 4 Joyce on Insurance (2 Ed.), sec. 2635-A.

One of the leading cases sustaining the suicide clause whether sane or insane, and which case is cited by all textwriters treating on the subject of life insurance or accident insurance, is that of Bigelow v. Berkshire Life Insurance Company, 93 U. S. 283, decided December 11, 1876, opinion by Mr. Justice Davis. It was insisted that the insured Bigelow had shot and killed himself with a pistol while he was insane. The court in delivering the opinion in the Bigelow case said:

"There has been a great diversity of judicial opinion upon the question whether self-destruction by a man, in a fit of insanity, is within the condition of a life policy, where the words of exemption are that the insured 'shall commit suicide,' or 'die by his own hand,' which is only another form of expression for suicide. But since the decision of Life Ins. Co. v. Terry, 15 Wall., 580, 21 L. Ed., 236,

the question is no longer an open one in this court. In that case the words avoiding the policy were 'shall die by his own hand;' and we held that they referred to an act of criminal self-destruction, and did not apply to an insane person who took his own life.

"But the insurers in this case have gone further, and sought to avoid altogether this class of risks. If they have succeeded in doing so, it is our duty to give effect to the contract, as neither the policy of the law nor sound morals forbid them to make it.

"If they are at liberty to stipulate against hazardous occupations or unhealthy climates, or death by the hands of the law, or in consequence of injuries received when intoxicated, surely it is competent for them to stipulate against an intentional act of self-destruction, whether it be the voluntary act of a moral agent or not. It is not perceived why they cannot limit their risks in any manner they see fit, provided the assured is told, in proper language, of the extent of the limitation and it is not against public policy.

"The language of this stipulation is shall 'die by suicide, sane or insane.' These words must receive a reasonable construction. If they be taken in their strictly literal sense, their meaning might admit of discussion; but it is obvious that they were not so used. 'Shall die by his own hand, sane or insane,' is, doubtless, a mere accurate mode of expression, but it does not more clearly declare the intention of the parties. Besides, the authorities uniformly treat the terms 'suicide' and 'dying by one's own hand' in policies of life insurance, as having the same meaning, and the popular understanding accords with this interpretation. The expression, 'dying by his own hand,' is, in fact, no more than the translation into English of the words of latin origin 'suicide.'

"As the line between sanity and insanity is often shadowy and difficult to define, this company thought proper to take the subject from the domain of controversy, and by stipulation exclude all liability by reason of death of the party by his own act, whether he was at the time a responsible moral agent or not. Nothing can be clearer than that the words 'sane or insane' were introduced for the purpose of excepting from the operation of the policy any intended self-destruction, whether the insured was of sound mind or in a state of insanity.'

"The Supreme Court of Tennessee has held in the case of Childress v. Fraternal Union, 113 Tenn., 252, that:

"'A clause in an insurance contract providing that only a proportionate part of the insurance shall be paid in the case of suicide of the insured is valid and binding upon the beneficiary.'

"In the Childress case there was a provision that the policy issued shall become incontestable after two years, provided, however, that 'if any member holding a benefit certificate issued by the Order

and while in good standing shall die by his own hands, that is, commit suicide, whether sane or insane, the indemnity to be paid to the beneficiary shall. be one-third of the amount otherwise due under such member's certificate had death resulted from natural causes.''

''The insured killed himself by cutting his throat with a razor. Mr. Justice Wilkes in delivering the opinion of the court cited with approval Elliott on Insurance, section 398, May on Insurance, section 322, Joyce on Insurance, from which we have quoted, and the case of Bigelow v. Insurance Company, 93 U. S., 284, from which we have quoted and other authorities, the court holding that the insured had made a binding contract with the insurer and his beneficiaries were bound thereby and they were only allowed to recover one-third of the policy.

The Supreme Court of Tennessee also held in the case of Silliman v. Insurance Company, 131 Tenn., 303, that:

'' 'A provision in a life insurance policy limiting recovery thereon to the amount of the premium in case of suicide while sane or insane within one year from the date thereof, is reasonable and should be favorably considered by the courts to prevent frauds on the Companies.'

''The opinion in the Silliman case was delivered by Mr. Chief Justice Neil. Silliman died as a result of suicide and in upholding the suicide clause our Court quoted with approval from case of Billings v. Insurance Co., 64 Vt., 78, and furthermore Chief Justice Neil said:

''The commission of suicide by an insured while in his right mind, if such a thing be possible, which some doubt, in order that the beneficiary in the policy may collect it, is nothing less than a fraud on the company; and so much of the clause as refers to persons of unsound mind is likewise worthy of favorable consideration, since the evidence of such a condition is easy to a fabricate and difficult for the insurer to overthrow. Therefore, it is not at all improper that insurance companies should by this clause render unnecessary any inquiry into the mental condition of the insured at the time of his self-destruction.''

The court said in the Billings case, supra:

''The defendant had the right to say that it would not hold itself responsible for the acts of the assured committed when insane, and the question is, can the court, with such a contract before it, attempt to measure the degrees of insanity? The construction contended for by the plaintiff renders the words 'sane or insane' immaterial, surplusage, of no force whatever. They must have been inserted for some purpose. Felonious suicide was not alone in the contemplation of the parties to the contract. If it had been,

there was no necessity of adding anything to the general words. The defendant says that 'by force of them we are not to be liable in case the assured dies by suicide, sane or insane,' and the only answer is: 'It is true the assured died by his own hand when insane, but he was very insane; in fact, so insane that when he took his life he did not know what he was doing, nor the effect of his acts.' If we adopt this construction of the contract, we add to it an element not agreed to by the parties. If the death of the assured was caused in the manner and under the circumstances stated in the plaintiff's offer of evidence, the defendant is not liable. There was nothing in the evidence nor offer of evidence tending to show an accidental discharge of the pistol, nor that death resulted from anything save the pistol shot fired by the assured. We hold there can be no recovery if the assured committed the fatal act otherwise than accidentally; that the clause 'suicide, sane or insane,' was intended to, and does, include self-destruction irrespective of the insured's mental condition at the time of the act which caused his death. This is the better rule, in that it gives effect to the contract made by the parties, and the logical conclusion of the better-considered cases.''

In Volume 17, L. R. A. (N. S.), p. 260, the author has collated a great number of cases where full notes are given and which support the rule as announced in the Bigelow v. Insurance Company case, 93 U. S., supra. We deem it not necessary to set out all the cases that are cited in these full notes as given by the learned author of L. R. A.

In Volume 7, Page 659 of Am. & Eng. Annotated cases, we find full notes on the question that we have under consideration and the author lays down this rule:

''The generally accepted rule is that a clause in a policy of life insurance exempting the insurer from liability on the policy in case the insured dies by his own hand or by suicide, sane or insane, is a valid limitation of the liability of the insurer and operates to avoid the policy in the event of the suicide of the insured while insane.''

''In suport of this rule cases are cited from England, U. S. Supreme Court, Court of D. C. and the following states: Georgia, Illinois, Iowa, Michigan, Missouri, North Carolina, Ohio, Pennsylvania and Texas.

''There are some States a few among the 48, that provide by Statute that:

'' 'It shall be no defense to an action on an insurance policy that the insured committed suicide, unless it shall be shown that the insured contemplated suicide at the time he made his application for the policy.'

"And it appears that the clause against suicide, sane, or insane, relieving the insured of liability, where the insured takes his own life, is not upheld in Kentucky or Wisconsin. But we find the great weight of authority since the Supreme Court announced the rule as laid down by Justice Davis in the case of Bigelow v. Insurance Company, 93 U. S., that a clause providing as in the instant case that there shall be no liability where it is shown that the insured came to his death by suicide, whether sane or insane, is a valid defense. Such clauses are upheld. Such a clause is not against public policy, and in the instant case the Insurance Company made a contract with Mr. Weber that it would not pay him if his death resulted by suicide, whether sane, or insane, and we should uphold this contract."

Other authorities upholding the rule that we announced in West, Extrix., v. The Insurance Company, are as follows: Trav. Insurance Co. v. McKinkey, 127 U. S. 661; Clark v. Equi. Life Assur-Soc. (C. C. A., 4th Cir.), 118 Fed., 374; U. S. F. & Go. Co. v. Blum, (C. C. A. 9th Cir.), 258 Fed., 897.

It results we find no error in the judgment of the lower court. All of the assignments of error are overruled and disallowed and the judgment of the lower court is affirmed. Judgment will be entered here against the complainant for the costs of the appeal. The costs of the lower court will be paid as there adjudged.

Heiskell and Senter, JJ., concur.